**PARTIDO NUEVO PROGRESISTA et al., Plaintiffs,**

v.

**Rafael HERNANDEZ COLON, Individually and as Governor of the Commonwealth of Puerto Rico, et al., Defendants.**

**Civ. No. 75–619.**

United States District Court, D. Puerto Rico.

March 26, 1976.

Baltasar Corrada Del Rio, San Juan, P. R., for plaintiffs.

Carlos R. Rios, Secretary of Justice, Miriam Naveira de Rodon, Sol. Gen., for the Commonwealth of Puerto Rico, Peter Ortiz, Deputy Sol. Gen., Dept. of Justice, Commonwealth of Puerto Rico, San Juan, P. R., for defendants.

Before COFFIN, Circuit Judge, TOLEDO, Chief District Judge, and TORRUELLA, District Judge.

## OPINION

PER CURIAM.

We are called upon to decide the constitutionality of certain provisions of Act No. 24 of May 22, 1975 (16 LPRA 2089) of the Commonwealth of Puerto Rico. This statute is an amendment to the Commonwealth's Electoral Code (16 LPRA 2001 et

seq.). In deciding this issue we must weigh the rights of freedom of speech and association in counterbalance to the police power of the state to regulate its electoral processes.

On June 5, 1975, Plaintiff Partido Nuevo Progresista (hereinafter called "Plaintiff PNP") and several individual Plaintiffs,[1] filed an action claiming that the mentioned statute violates the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States. Plaintiffs sought the convening of a Three-Judge District Court, pursuant to 28 U.S.C. 2281 and 2284 for the purpose of declaring said statute unconstitutional and enjoining its enforcement. On June 6, 1975 the District Court issued a temporary restraining order against the enforcement, *pendente lite*, of the statute in question. On June 23, 1975 Plaintiffs filed an amended complaint alleging in substance claims similar to those contained in the original complaint. On July 3, 1975 a temporary restraining order was issued pursuant to 28 U.S.C. 2284(3), which order was later amended on July 16, 1975, enjoining the enforcement of the law in question until a decision by the Three-Judge District Court.

Plaintiff PNP is a duly recognized political party registered as such in accordance with the laws of the Commonwealth of Puerto Rico.[2] In the general elections held on November 7, 1972 said party obtained approximately 44% of the votes cast. In these elections Plaintiff PNP elected several of its candidates, including some members to the Senate and House of Representatives of the Commonwealth, wherein it is now the principal minority party. It is presently engaged in political activities throughout Puerto Rico in preparation for general elections scheduled to take place on November 2, 1976.

The individual Plaintiffs are bona fide members of Plaintiff PNP and are actively participating in political activities of said party, including fund-raising activities sponsored by this party at its own initiative.

Defendant Rafael Hernández Colón (hereinafter called "Governor Hernández Colón") is the Governor of the Commonwealth of Puerto Rico and the President of the Popular Democratic Party, which in the 1972 elections previously referred to, received approximately 51% of the votes cast and won a majority of the seats in both the Senate and House of Representatives of the Commonwealth of Puerto Rico. Defendant Carlos Ríos (hereinafter called "Secretary Ríos") is the Secretary of Justice of the Commonwealth of Puerto Rico. Defendants José Rodríguez Aponte, Osvaldo de la Luz Vélez and José Orlando Grau are the chief officers of an administrative agency established pursuant to the Electoral Code, referred to hereafter as the "Electoral Court", and are charged by said Code with the primary enforcement of the statute here in question.

## PROPER PARTY DEFENDANTS

As a threshold matter, we must determine whether Governor Hernández Colón and Secretary Ríos are proper party Defendants.

Pursuant to the Constitution of the Commonwealth of Puerto Rico, "The Governor shall execute the laws and cause them to be executed." Art. IV, Sec. 4. Any violation of the Electoral Code (16 LPRA 2001 et seq.) constitutes a crime, which under 3 LPRA 72 requires that Secretary Ríos be the prosecutor. Additionally, Section 2–009(c) of the Electoral Code (16 LPRA 2029(c)) requires the Electoral Court to request that the Secretary of Justice file whatever civil and criminal actions be deemed necessary to enforce said Code.

A state officer may be named as a party defendant provided such officer has some connection with the enforcement of

---

1. Dolores González, Marilina Sanz, Irma González García and Carmen N. Colón, hereinafter called "Individual Plaintiffs."

2. The facts in this case were stipulated by the parties.

the statute in question, which connection may be created by the statute itself or may arise out of the general law. *Ex parte Young*, 209 U.S. 123, 156–158, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984, 988 (D.C. S.D.N.Y.1970), aff'd, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970).

■ It seems clear that both Governor Hernández Colón and Secretary Ríos meet this standard as party defendants.

## THE CONSTITUTIONAL CHALLENGE

The issues raised by this case concern questions "not less than basic to a democratic society." *United States v. United Auto Workers*, 352 U.S. 567, 570, 77 S.Ct. 529, 530, 1 L.Ed.2d 563 (1957). The principal thrust of Plaintiffs' challenge lies in their contention that Act No. 24 constitutes an impermissible restraint on the right of free speech and association. A related attack is that this statute violates due process by reason of its vagueness.

In studying these questions a brief perusal of the history and setting within which the questioned provision is found may be of some use.

■ As previously indicated, Act No. 24 is only a recent addition to a larger framework which is commonly referred to as the Electoral Code of Puerto Rico, 16 LPRA 2001 et seq. The purpose of the Electoral Code is to regulate all aspects of the Commonwealth's electoral process by means of an integrated and comprehensive electoral system. The Legislature thus intended to create public confidence in this system and to this purpose, among others, it sought to control certain practices prevalent among the various political parties.

Generally, the Electoral Code contains provisions creating the Electoral Court and defining its functions (16 LPRA 2021, 2027); establishing a "Bill of Rights" for voters (16 LPRA 2131); specifying electoral crimes and their penalties (16 LPRA 2501 et seq.); and regulating the matters of elections (16 LPRA 2331 et seq.), primaries (16 LPRA 2251 et seq.), referendums and plebiscites (16 LPRA 2451 et seq.), and the registration of voters (16 LPRA 2181 et seq.).

More specifically as relates hereto, the Electoral Code contains a comprehensive scheme to regulate campaign finances (16 LPRA 2081 et seq.). Under this framework an electoral fund is created for the purpose of financing the administrative and campaign expenses of political parties and independent candidates (16 LPRA 2081). Other funds for general expenses (16 LPRA 2083), and voters' transportation (16 LPRA 2084), are available to be distributed on the basis of performance at the polls. Appropriate accounting procedures are established regarding moneys that are chargeable to the electoral fund (16 LPRA 2087). The statute also limits the amount that private citizens or entities may contribute to political parties or independent candidates (16 LPRA 2088). These amounts vary depending on whether it is an election or non-election year.

Respecting the present case, the core provisions are those dealing with the disclosure and reporting of private monetary contributions to political parties. These are contained in Article 3–009 of the Electoral Code (16 LPRA 2089), of which paragraph (B) includes the amendment to the Code presently under challenge.

Although the validity of Paragraph (A) of Article 3–009 is not here in question, we must refer to it to determine the issue at hand. That paragraph establishes that each political party and candidate is required, under oath, to inform the Electoral Court of the date, amount, name and address of every person contributing money to them. This report shall be made every three months, except that commencing on March 1 of each election year, this report must be filed every fifteen days.

As originally enacted in the Electoral Code of 1974, the predecessor to the present paragraph (B) reads as follows:

"(B) Whenever in any massive political activity including 'mass meeting'

any fund raising takes place, the collector or collectors shall, after the fund raising takes place, prepare a sworn statement, certifying the total amount of money collected and that none of the contributors exceeded the amounts established by this Code. This statement shall be filed in the Electoral Court within the following five (5) days." [3]

By virtue of Act No. 24 of 1975 (16 LPRA 2089), paragraph (B) was amended to read in the following manner:

"(B) Whenever in any massive political activity including mass meetings, marathons, concentrations, picnics, or similar activities, any fund raising takes place, the collector or collectors shall, after the fund raising takes place, prepare a sworn statement, stating the type of political activity held, an estimate of the number of attendants thereof, the amount raised, and that none of the donors gave an amount in excess of the amounts permitted by this Code. Said statement shall be filed at the Electoral Court within the following five (5) days. Whenever a political party is to celebrate a fund raising activity under the provisions of this paragraph, it shall, at least ten (10) days in advance of the celebration of said activity, notify the Electoral Court of its intention to effectuate such fund raising, the date and place thereof, so that the Electoral Court desig-

nate one or more representatives to supervise said fund raising. It shall be illegal for a political party to receive funds under this paragraph if it does not comply with the procedures set forth herein." [4]

The Electoral Code provides various criminal penalties for violation of this provision. 16 LPRA 2501 et seq.

The available legislative history of this provision is less than clear as to the reasons leading to this amendment.

The Report of the Government Committee of the House of Representatives of the Commonwealth Legislature that considered Act No. 24 makes no reference to the provisions here in question.[5] The Report of the House's Civil Judicial Committee is equally lacking.[6]

The Report of the Government Committee of the Senate makes passing reference to the reason behind this amendment: to prevent the use of massive political activities for the purpose of circumventing the contribution limits. In this manner it is sought to "place a restraint on the temptation of violating" these provisions.[7]

The Report of the Conference Committee of both Houses regarding the provision here in question is limited to amending the notice requirement to the Election Board from 15 days to the present requirement of 10 days.[8]

Although public hearings seem to have been held by the various legislative committees, only partial transcripts of the same are presently available.

3.  Translation supplied by the Court.

4.  Id.

5.  See "Informe, Comisión de Gobierno, Cámara de Representantes, 7ma. Asamblea Legislativa, 3ra. Sesión Ordinaria, abril de 1975, P. de la C. 1292."

6.  See "Informe Comisión Jurídico Civil, Cámara de Representantes, 7ma. Asamblea

Legislativa, 3ra. Sesión Ordinaria, abril de 1975, P. de la C. 1292."

7.  See "Informe Comisión de Gobierno, Senado, 7ma. Asamblea Legislativa, 3ra. Sesión Ordinaria, 5 de mayo de 1975, P. de la C. 1292", at pages 1–2.

8.  See "Informe Comisión de Conferencia, P. de la C. 1292, 7ma. Asamblea Legislativa, 3ra. Sesión Ordinaria, 14 de mayo de 1975."

Most States[9] as well as Congress[10] have legislated in this area. There is, however, no statute within the jurisdiction of the United States that compares to Article 3–009(B).

## THE FIRST AMENDMENT AND ARTICLE 3–009(B)

If we accept, *arguendo*, that the challenged statute is a political contribution limitation and disclosure provision, a contention which is not unreasonable in view of the context within which it is framed, our guidelines for the "exacting scrutiny" demanded under the circumstances are fairly well established. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, 44 L.W. 4127, 4134, 4146 (1976).

■ It can no longer be argued that the contribution of money by individuals in support of political parties and candidates, as well as the compelled disclosure thereof, is not subject to regulation by the State. *Buckley v. Valeo*, supra. But these restrictions "operate in an area of the most funda-mental First Amendment activities", and thus this Amendment "affords the broadest protection to such political expression in order 'to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley*, supra, p. 14, 96 S.Ct. p. 632, 44 L.W. p. 4131. Speech in this area, which concerns public affairs, is more than self expression, "it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

■ Contribution limitations constitute direct quantity restrictions on political communication by persons, groups, candidates, and political parties, *Buckley*, supra, 424 U.S. p. 18, 96 S.Ct. 612, 44 L.W. p. 4132. However, they entail only a marginal restriction upon the contributor's ability to engage in free communication, *Buckley*, supra, p. 20, 96 S.Ct. 612, 44 L.W. p. 4133. While limiting one important means of associating with a candidate or party, they nevertheless "leave the contributor free to

9. See Ala., Code tit. 17, sec. 272, 278–80 (Cum. Supp.1973); Alaska Stat. Sec. 15.13.040, .070, .110 (Supp. Oct. 1975); Ariz. Rev.Stat.Ann. sec. 16–423, 5, 6 (Supp.1975); Ark.Stat.Ann. sec. 3–1102 (Supp.1973); Cal. Gov't Code sec. 84200–14, 85100–108 (West Supp.1975); Colo.Rev.Stat.Ann. sec. 1–30–107 (1974); Conn.Gen.Stat.Ann. sec. 9–341(a) to (c), –348s (Supp.1975); Del.Code Ann. tit. 15, sec. 8004(a), 8006, 8007 (Supp.1974); D.C.C.E. sec. 1–1136, –1161, –1162 (Supp.1975); Fla. Stat.Ann. sec. 106.07, .08 (Supp.1975); Ga. Code sec. 40–3805, –3806, –3807 (Supp.1974); Hawaii Rev.Stat. sec. 11–195, –196, –197, –206 (Supp.1974); Ill.Rev.Stat. ch. 46, sec. 9–10, –11, –12, –13 (Supp.1975); Ind.Code sec. 3–1–30–5, –7, –8 (Supp.1975); Iowa Code Ann. sec. 56.6, .14 (Supp.1975); Kan.Stat.Ann. sec. 25–4108, –4114 (Supp.1974); Ky.Rev.Stat.Ann. sec. 121.180 (Supp.1974); Me.Rev.Stat.Ann. tit. 21, sec. 1395, 6, 7 (Supp.1975); Md.Code Ann. art. 33, sec. 26–8, –11 (Cum.Supp.1974); Mass. Gen.Laws Ann. ch. 55, sec. 16, 17A (1975); Mich. Compiled Laws Ann. sec. 168.908b (Supp.1975); Minn.Stat. sec. 211.06, .20 (Supp. 1975); Miss.Code Ann. sec. 23–3–41, –43 (1972); Proposition 1, adopted Nov. 5, 1974, sec. 3, 7; Mo.Ann.Stat. (Vernon App. Pamphlet 1975, p. 89); Mont.Rev.Codes Ann. Sec. 4730, 4731 (Supp.1974); Neb.Rev.Stat. sec. 32–1101, –1102, –1103 (1974); Nev.Rev.Stat. sec. 218.-032, .038 (1973); N.H.Rev.Stat. sec. 70:4 to 70:8 (Supp.1975); N.J.Rev.Stat. sec. 19–44A–16,

–18, –29 (Supp.1975); N.M.Stat.Ann. sec. 3–19–9 (1970); id. 3–19–2 (Supp.1975); N.Y.Election Law sec. 473, 4, 8, 9 (McKinney Supp. 1975); N.C.Gen.Stat. sec. 163–278, 9, .13 (Cum. Supp.1975); N.D.Cent.Code sec. 16–20–04 (1971); Ohio Rev.Code Ann. sec. 3517.08, .10, .11 (Supp.1974); Okl.Stat.Ann. tit. 26, sec. 424.3 (Cum.Supp.1975); Or.Rev.Stat. sec. 260.072 (1973); Pa.Stat.Ann. tit. 25, sec. 3227 (Supp.1975); R.I.Gen.Laws Ann. sec. 17–25–6, –7, –11 (Supp.1974); S.C.Code Ann. sec. 23–265.1 (Supp.1974); S.D.Compiled Laws Ann. sec. 12–25–7, –13 (1975); Tenn.Code Ann. sec. 2–1008, –1011 (Supp.1975); Tex.Election Code sec. 14.03a, .07 (Supp.1975); Utah Code Ann. 20–14–7, –16 (Supp.1975) (restricted to communications media expenditures); Vt.Stat. Ann. tit. 17, sec. 2053, 2054 (Supp.1974); Va. Code Ann. sec. 24.1–257 (Supp.1975); Wash. Rev.Code Ann. sec. 42.17.080, .090, .140 (Supp. 1974); W.Va.Code sec. 3–8–5, –10 (1971); id. 3–8–2 (Supp.1975); Wis.Stat.Ann. sec. 11.06–11.22, 12.20, .21 (Supp.1975); Wyo.Stat.Ann. 22.1–389, –393 (Supp.1975).

10. Federal Election Campaign Act of 1971, Pub.L. No. 92–225, 86 Stat. 3, as amended, Federal Election Campaign Amendments of 1974, Pub.L. No. 93–443, 88 Stat. 1263, 2 U.S.C. 434 (Cum.Supp.1975); 18 U.S.C. 608 (Supp. 1976).

become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *Buckley,* supra, p. 22, 96 S.Ct. p. 636, 44 L.W. p. 4133. In the area of contribution limitations, "[e]ven a ' "significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedom." *Buckley,* supra, p. 25, 96 S.Ct. p. 638, 44˙L.W. p. 4134.

■ To the extent that the questioned statute is a disclosure provision, as distinguished from its being part of a contribution limitation scheme, it is equally clear that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley,* supra, p. 64, 96 S.Ct. p. 656, 44 L.W. p. 4146. Significant encroachment of First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. See generally Development—Election Laws, 88 Harv.L. Rev. 1111, 1237 (1975). "[T]he subordinating interests of the State must survive exacting scrutiny . . .", and there must " . . . be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed . . . This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct governmental action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." *Buckley,* supra, 64, 96 S.Ct. 656, 44 L.W. 4146. Furthermore, " . . . the invasion of privacy of belief may be as great when the information sought concerns the giving . . . of money as when it concerns the joining of organizations, for '[f]inancial transactions can reveal much about a

person's activities, associations, and beliefs.' " Id.

Notwithstanding the above, as in the case of contribution limitation, it is "acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved . . .", and where the " . . . disclosure requirements . . . appear to be the least restrictive means of curbing the evils" pursued. *Buckley,* supra, 66, 96 S.Ct. 658, 44 L.W. 4147.

From the legislative history of Article 3–009(B), supra, it is apparent that the Legislature intended that this paragraph be a loophole-closing provision for the other contribution limitation and disclosure sections of the Electoral Code.[11] Although we are not here to substitute our judgment for that of the Commonwealth Legislature, considering the constitutional standards to which we are bound, we must analyze this Article to see whether it provides "an answer that sufficiently relates to the elimination of those dangers . . . [as] . . . no substantial societal interest would be served by a loophole-closing provision designed to check corruption that permitted unscrupulous persons and organizations . . . " to easily circumvent it. *Buckley,* supra, 45, 96 S.Ct. 647, 44 L.W. 4140.

If we assume for the moment[12] that in regulating the conduct in "massive" political activities the Legislature intended to cover political gatherings of hundreds or thousands of attendants,[13] it is difficult to see how the presence of "one or more" government inspectors can substantially contribute to keeping political contributions, and their corresponding disclosures, within the limits of the law. Even if several such observers were sent to a mass meeting, they would constitute but a small fraction of those present. It would then seem

---

11. See n. 7 herein.

12. The issue of vagueness will be discussed later in this opinion.

13. See transcript of Senate proceedings for May 6, 1975, at pages 48–49.

482

illusory to conclude that under such circumstances their presence would add anything of substance to effective supervision of the fund raising. Considering that under paragraph (B), as distinguished from paragraph (A), no record of the name, address or individual amount contributed need be kept or reported, anyone truly desirous of violating the law could easily circumvent it (with or without the collusion of the organization or candidate sponsoring the activity) by sending several donations within the legal limits through various cohorts, or by contributing at different times or occasions during the course of the same gathering. On the other hand, if inspectors at a large meeting—in a building or outdoors—are truly to be able to assure that "none of the donors gave an amount in excess of the amounts permitted by this Code", they would be required in such numbers and their presence would necessarily be so intrusive as to further the chilling effect which we discuss below.

Under these circumstances the actual promotion of a "substantial societal interest" by the presence of governmental inspectors at a political activity is tenuous.

Our concern is accentuated by the absence of any record showing that pre-existing sanctions were inadequate. As the Court observed in Buckley, "there is no indication that the substantial criminal penalties for violating the contribution ceilings [and the disclosure provisions] combined with the political repercussion of such viola-

tions will be insufficient to police the contribution provisions. Extensive reporting, auditing and disclosure requirements applicable to contributions . . . are designed to facilitate the detection of illegal contributions." Buckley, supra, p. 56, 96 S.Ct. p. 652, 44 L.W. p. 4143. We might add our skepticism that a donor bent on giving illegal excessive contributions would be likely to choose as the scene of his crime a mass meeting—where he might well be observed by others but might well not come to the attention of those he seeks to influence. In view of this, it is appropriate to recall the proscription of the Supreme Court in Whitney v. California, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927), to the effect that " . . . fear . . . cannot alone justify suppression of free speech and assembly." See also Kramer v. Union School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

■ In providing for the presence of governmental inspectors at associational gatherings protected by the First Amendment the statute goes one step further than that approved by Buckley in upholding the validity of contribution and disclosure regulations.[14] The statute in question fails to pass constitutional muster because the intrusion by the inspectors brings about a "chilling" effect on the exercise of First Amendment rights [15] which can be prevented by less

14. The right of associational privacy has been upheld as overriding claimed governmental interest, in probing subversive activities (Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957)); in regulating corporations doing business in the state (NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)); in preventing false or fraudulent political advertising requiring that handbills identify individual sponsors (Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960)); in scrutinizing the fitness of teachers (Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)); in probing possible subversive influence in race relations (Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963)); in regulating foreign travel for espionage purpose (Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992

(1964)); in screening "Communist political propaganda" from abroad (Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965)); in protecting defense industries (U. S. v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967)); and in assessing the character and fitness of applicants for admission to the bar (Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971)); (In re Stolar, 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971)). Associational privacy includes those whose association is for the purpose of electoral activity. (American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974)); (Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)).

15. Dombrowski v. Pfister, 380 U.S. 479, 487, 489, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); cf. Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780,

drastic means. *Buckley*, supra, 424 U.S. pp. 68–69, 96 S.Ct. p. 658, 44 L.W. p. 4147; *Lamont v. Postmaster General*, 381 U.S. 301, 310, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring); *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). This is particularly so when we consider that from the standpoint of actually controlling the evil pursued, the presence of the inspectors adds little of practical value. If there are but one or two inspectors in attendance at a large meeting, perhaps the chilling effect would be minor; but in such case their presence would be known not to be useful in enforcing the law and those present might understandably wonder what other purposes were being served. To the extent that a few inspectors might undertake random samplings, the very randomness of such efforts could create consternation on the part of those selected for close observation. And, as we have noted, a force of inspectors large enough to monitor effectively would be a sizeable cadre at any meeting of several hundred or more people. This is aggravated by the fact that political gatherings are not only attended by persons who contribute funds, but also by those who engage in political speech, formal or otherwise, and by those who may wish to exercise their right to political association by their mere presence without any further participation. It may be argued that anyone who is willing to go to a public political meeting has already exposed himself to the possibility of "opposition spies" being present. However, we believe there is a distinction between the impact of such run-of-the-mill intruders and an obvious official governmental presence.

Furthermore the presence of supervisors and the other attending requirements of Article 3–009(B) "impose significantly more severe restrictions on protected freedoms of political expression and association" than are required to achieve the goal sought.

*Buckley*, supra, 424 U.S. p. 23, 96 S.Ct. p. 636, 44 L.W. p. 4134. A cannon has been used to kill a mockingbird. The restrictions are about as justified as imposing the presence of tax collectors at church services to supervise the collection box because some people claim false donations in their income tax returns. On the other hand, requiring compliance with paragraph (A), or with the unamended paragraph (B), together with the attendant criminal penalties in effect for their violation, certainly represent less drastic means of achieving the avowed legislative purpose, and considering the practical failings of the challenged statute do not seem to us demonstrably less effective in their outcome. See Note "Less Drastic Means and the First Amendment", 78 Yale Law Journal 464 (1968–9); "The Doctrine of the Reasonable Alternative", by Francis D. Toormith and Harris G. Mirking, 9 Utah Law Review 254 (1964). In such a manner both compliance with the limitation on political contributions and their disclosure would be accomplished without unnecessarily impinging upon the associational rights of those participating in political activities.

## VAGUENESS

Plaintiffs have also challenged Article 3–009(B) alleging that it is unconstitutionally vague.[16] Notwithstanding our holding thus far in this case, we are constrained to pass upon this matter because the challenged language is similar to that contained in paragraph (B), before its amendment.

In this area the guidelines, as restated in *Buckley*, supra, p. 40, 96 S.Ct. p. 645, 44 L.W. p. 4139, are as follows:

"     .     .     .     Close examination of the specificity of the statutory limitation is required where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests .     .     .     The test is whether the language     .     .     .     affords the '[p]recision of regulation [that] must be the touch-

29 L.Ed.2d 284 (1971). See also footnote 47 at page 40 of 424 U.S., at page 645 of 96 S.Ct., at page 4139 of 44 L.W. of *Buckley*, supra.

16. The vagueness problem and the "chilling effect" allegations are not totally unrelated problems. See footnote 3 of 78 Yale Law Journal 464, supra.

stone in an area so closely touching our most precious freedoms.'" (Citations omitted).

The Court further expounds (at footnote 48):

"In such circumstances [that is, referring to legislation which imposes criminal penalties in areas related to First Amendment interests], vague laws may not only 'trap the innocent by not providing fair warning' or foster 'arbitrary and discriminatory application' but also operate to inhibit protected expression by inducing 'citizens to "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked . . .' 'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" (Citations omitted).

See also at *Buckley*, supra, p. 41, 96 S.Ct. p. 645, 44 L.W. p. 4150.

The focus of the vagueness allegation is concerned with the term "massive political activity." The statute contains no definition of this terminology.

In looking at the history of the statute we encounter the following discussion as the only indication as to what was intended by the Legislature by this term.[17]

"Senator Mellado Parsons: Mr. President, I would like for someone, or one of the members of the Commission, or Senator Marcano, to explain for the record the scope of the term 'massive', in the Article 3–009 of page 5:

President Pro Tempore (Senator Palmer): Would you like to direct your question to the distinguished colleague, the President of the Government Commission?

Senator Latoni Rivera: Yes, by 'massive' we understand, my distinguished colleague, a big concentration. We are not going to say a ward meeting where fifteen or twenty persons participate. We are talking about a concentration of thousands of people.

Senator Mellado Parsons: —A political meeting, in a ward where there are—say—two hundred persons.

Senator Latoni Rivera: No, that is not a massive concentration.

Senator Mallado Parsons: With what number, more or less, would we count on a political activity becoming massive?

Senator Latoni Rivera: To our best belief from eight hundred to a thousand persons."

This is the extent of precision upon which Plaintiffs are required to rely in determining whether they can engage in conduct which may have serious criminal consequences. We can all too easily conjecture the uncertainties of sponsors of a planned political meeting: would 500 be "massive"? if not so in San Juan, would it be in Caguas? if a planned small affair swells to large proportions because of some late developing issue or attendance of a major figure, is the party subject to penalties? We are compelled to conclude that also on these grounds Article 3–009(b) fails to meet constitutional standards.

In so holding we are not unmindful of those cases existing in other areas of the law wherein the term "mass picketing" has been held to be sufficient to permit the regulation of activity associated with First Amendment freedoms. Cf. *Allen–Bradley Local v. Wisconsin Employment Relations Board*, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942). The distinction from the present case is clear in that in the "mass picketing" situation what is sought to be controlled is not necessarily the number of persons picketing, but rather the impact of their conduct on third persons. That is, the number of pickets has relevance only as it tends to establish the potential or calculated restraining effect. Thus, under different circumstances the same number of pickets may or may not be "massive" depending upon the manner in which said activity is carried out. For purposes of the present

---

17. See Record of the Senate proceedings, May 6, 1975, pages 98–99. The translation to the above reproduction is supplied by the Court.

subject matter however, the numbers are of essence to a determination of whether a criminal violation has been committed, and therefore precision of definition is constitutionally required. Cf. *Royal v. Superior Court of New Hampshire*, 531 F.2d 1084, 1st Cir., decided March 12, 1976.

In view of the above we conclude that Article 3–009(B) of the Electoral Code is unconstitutional and shall proceed to issue Injunction in accordance with this Opinion.[18]

**18.** We are not called upon to decide other matters decided by *Buckley*, supra, which may have a bearing on other provisions of the Electoral Code.